**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0016-16T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.S.,

    Defendant-Appellant,

and

T.R.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF Z.B. AND K.A.Z.B., minors.

_____

        Submitted June 1, 2017 - Decided  June 21, 2017

        Before Judges Lihotz, O'Connor and Mawla.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Mercer County,
        Docket No. FG-11-03-16.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Steven Edward Miklosey,
        Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Joshua P. Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Louise M. Cho, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant K.S. appeals from an August 15, 2016 judgment, terminating her parental rights and granting guardianship to plaintiff, the Division of Child Protection and Permanency (the Division) for the purpose of securing the adoption of her two biological children, Z.B. and K.A.Z.B., ages eight and three, respectively. On appeal, defendant argues the Division failed to prove the statutory prongs necessary to terminate parental rights, by clear and convincing evidence. We have reviewed her arguments in light of the record and applicable law. We conclude the trial judge's findings are sufficiently supported by the record evidence. Accordingly, we affirm.

Defendant experienced repeated and severe trauma and loss starting at age nine, when she was sexually molested by a male relative. A few years later, her stepfather was murdered, shortly followed by the death of her mother. Consequently, defendant suffers from post-traumatic stress disorder. Defendant gave birth

to her older child when she was thirteen. At that time, defendant was diagnosed with bipolar disorder and post-partum depression, when she reported auditory and visual hallucinations, began cutting herself, attempted suicide, and experienced thoughts of harming her infant. She was hospitalized, commenced therapy, and prescribed Abilify and Lamictal.

The Division became involved with the family in 2010. Defendant was placed in the residential custody of her maternal aunt, and, with defendant's consent, her child was placed in the residential custody of another maternal aunt. Problems arose. Defendant and her custodial aunt became engaged in a physical altercation, defendant assaulted a school official when caught stealing, she experienced suicidal ideations, and was again hospitalized. When interviewed by the Division, defendant's aunts both requested to relinquish custody of defendant and her child.

On July 1 and 2, 2011, the Division conducted an emergency removal of defendant and her child. After a short stay at Harbor House Adolescent Shelter, defendant and her child were reunited in a resource home.

The Division's attempts to place defendant with family members was unsuccessful. Defendant's biological father was unwilling and unable to provide a suitable home for her and her child; her grandfather, who lived in Florida, was unable to cope

with defendant's mental health issues. A cousin in Florida was disqualified when she failed to complete half the necessary parenting classes and maintain contact with the Division.

Defendant struggled in school, was adjudicated delinquent, and failed to follow her resource mother's house rules, as she would leave for several hours without telling anyone where she was going.

The Division arranged for various services, which included individual mental health treatment, medication, grief counseling, anger management, life skills, parenting classes, and enrollment in the Strengthening Adolescent Families through Empowerment "Mommy and Me" program. Defendant made positive strides in her own individual care and that of her child. Unfortunately, within a year, her condition deteriorated. On November 7, 2012, the Division amended its complaint to seek care and custody of defendant's child, which was granted. Defendant's reunification efforts were renewed and she and her child were placed in the legal and physical custody of her cousin in Florida. There, defendant became pregnant with her second child and returned to New Jersey. Defendant, now over eighteen, agreed to continue with the Division's recommended services and returned to her former resource home.

A-0016-16T1

In a few months, defendant expressed frustration complying with the services she was to engage. She told the Division to "just take" the children, which prompted an emergency removal from her care and the initiation of litigation.

Defendant resumed participation with the Division, attended services, supervised visits, medication monitoring, and therapy, which were recommended by Alexander Iofin, M.D., a psychiatrist, to control defendant's significant psychiatric and behavioral difficulties. Defendant initiated efforts to find employment and housing. She maintained contact with the children through supervised visitation.

A psychological evaluation by Amy Becker-Mattes, Ph.D., recommended defendant continue medication management and therapy and re-enroll in a Mommy and Me program. Defendant registered for evening classes at Mercer County Community College, continued supervised visitation, and began overnight-supervised visits at the Children's Home Society. Unfortunately, defendant changed her residence, cancelled visits, was terminated from her parenting classes for non-attendance, failed to attend one-half of the scheduled therapy sessions, and was expelled from the shelter residence for violating curfew. Defendant moved in with a friend.

The judge ordered a continuation of services, including defendant's participation in a Mommy and Me program. Locating a

A-0016-16T1

program proved difficult; defendant's request for placement was rejected because she had been dismissed from similar programs. The Division located the NJ Mentor program, which proposed placing defendant in a therapeutic home under the supervision of resource parents, which would demonstrate stabilization, a necessary precondition for admittance into the Mommy and Me program. Defendant declined the arrangement and also refused to participate in an updated psychiatric evaluation with Dr. Becker-Mattes, advising she would be out-of-town.

The Division learned defendant was living with a boyfriend and working for Burlington Coat Factory. Defendant reported she was not taking her prescribed medications as directed and acknowledged she experienced anger management difficulties. Consequently, the Division reevaluated its permanency goal for the children. Learning this, defendant resumed her medication, agreed to attend trauma-focused counseling, restarted parenting classes, and had supervised visitation.

Dr. Iofin updated his psychiatric evaluation on July 1, 2015. Although he did not alter his prior findings, he now recommended defendant receive random drug screens because of the proclivity for drug use among people suffering the types of psychiatric issues as defendant.

A-0016-16T1

The Division filed for guardianship on July 29, 2015. By then defendant had moved again, lost her job, was not maintaining her medication, missed counseling sessions despite being provided transportation, was terminated from therapy for nonattendance, missed the first day of a new job, and tested positive for cocaine.

Dr. Becker-Mattes updated her psychological evaluation on August 14, 2015. She also performed bonding evaluations between the children and their resource parents, then between defendant and the children. Defendant retained Andrew P. Brown III, Ph.D., who performed similar bonding evaluations.

Other family members were contacted as possible resource placements for the children. Defendant's father, sister, and cousin did not respond to the Division's requests, or failed to complete the requisites for placement. The older child's father was located in Florida, and was considered, but he neither expressed a desire nor expended the effort to cooperate with the Division. The child's paternal grandmother was considered, but the Florida Department of Children and Families declined her application for licensure. The Division could not locate the younger child's father.

Trial began on January 12, 2016. The Division presented testimony from caseworker, Tamika Somorin, the children's resource mother, and LaToya Gaines, a Division adoption caseworker. The

Division's expert was Dr. Becker-Mattes, and numerous documents were admitted into evidence. Defendant presented expert testimony from Dr. Brown and testimony from Edwige Paul Theokas, her counselor and her former foster mother. Finally, defendant testified on her own behalf.

We detail the expert testimony. Dr. Becker-Mattes administered standardized testing, reviewed defendant's records, and conducted clinical interview sessions. She concurred with defendant's diagnosis of bipolar disorder, which required regular mood stabilizing medication and ongoing therapy. Dr. Becker-Mattes explained people suffering from bipolar disorder commonly avoid taking medication during manic episodes, which becomes problematic during subsequent depressive episodes. Specific to defendant, she reviewed her history of stability periods followed by lapses and noncompliance. Dr. Becker-Mattes explained these periods of lapsed medication posed a significant risk to the children because, when defendant did not take her medication, she experienced mood swings, excessive irritability, excessive energy, and impaired judgment.

From her evaluation, Dr. Becker-Mattes concluded defendant could not serve as an independent caretaker for the children. Of particular concern was defendant's inconsistencies with medication monitoring, which in turn resulted in defendant's abandonment of

other services.  Dr. Becker-Mattes also noted defendant's standardized test results showed an "elevated [g]randiosity subscale."  She interpreted the results as showing defendant displayed interpersonal overconfidence, preventing her willingness to listen to others, even though she needed assistance and guidance.

In discussing the bonding evaluation results, Dr. Becker-Mattes observed defendant was very affectionate with the children; she nuzzled and kissed them.  She later withdrew emotionally and was "on edge."  Defendant issued many instructions and reprimanded the one-year-old when she dropped cards, causing the child to cry.  She deflected this by stating: "I don't care about that attitude stuff; I'm not [the children's resource mother]."  Further, in Dr. Becker-Mattes' opinion, defendant overstimulated the children, which was a stressful and unhealthy dynamic for all.

Dr. Becker-Mattes opined defendant's very sudden change in behavior reflected she was not properly taking her medication. Overall, Dr. Becker-Mattes concluded the bond between mother and children was "quite negative."

In contrast, Dr. Becker-Mattes concluded the bonding between the children and their resource parents was strong and positive. The resource parents participated in structured and goal-oriented activities and provided the children with positive feedback and

encouragement. The younger child appeared particularly affectionate, putting her head on the resource mother's knees; also, the older child appeared calmer and more relaxed than with defendant.

Dr. Becker-Mattes concluded the children would suffer harm if separated from their resource parents. She also stated defendant was not likely, or able, to mitigate the harm resulting from such a loss.

Dr. Brown was qualified as an expert in clinical neuropsychology. Dr. Brown's methodology was similar to Dr. Becker-Mattes, as he administered different standardized tests and conducted a clinical interview. He rejected the use of various projective tests, including the personality assessment inventory cited by Dr. Becker-Mattes, because they were of poor "reliability and validity." Further, he noted defendant had no confirmed history of child abuse, making tests measuring that possibility more likely to result in a false positive. He criticized the Division's treatment of defendant as unfair, suggesting it was "paying lip service" to the goal of reunification.

Dr. Brown reviewed defendant's records, confirming she suffered from bipolar disorder, for which she was prescribed medication, and engaged in "sporadic" treatment. He emphasized defendant's efforts and successes, including graduating from high

school, gaining employment, and maintaining a residence. He reviewed her current circumstances of housing and employment, describing them as stable, and noted she was making future plans. He highlighted defendant was "putting forth a great deal of effort at her young age . . . despite her past, despite her traumas, to be a mother to her children." He noted defendant expressed awareness of her inappropriate behavior and agreed she needed help.

Dr. Brown noted defendant's continued success hinged upon education, and a developed awareness and understanding of bipolar disorder, asserting "if [defendant] remains compliant with her psychiatric management, then I think the prognosis is very good." Dr. Brown agreed, "80% of bipolar patients stop taking their medication," which was a very likely possibility in defendant's case. He advocated defendant would overcome relapses with "cognitive behavior therapy," which he did not find referenced in defendant's records. Dr. Brown "had no concerns" about defendant's ability to provide independent care for the children because her composite score on testing "did not render her to be outside of the norm of the community."

Dr. Brown also concluded the children were bonded to defendant, she did not display "episodes of anger, . . . shallow frustration tolerance or irritability or . . . anything that would

11

indicate she was a threat to harm her children." Further, "[s]he showed patience. She responded gently to her children. So her symptoms, again, appear to be under control."

He agreed the children were comfortable with their resource parents, with whom they were bonded and appeared closer to the resource mother than the father. Dr. Brown testified the resource parents were the children's psychological parents, but defendant was their natural parent, and consequently, their bond with her was stronger, particularly the bond by the older child. Dr. Brown believed it was rare for children to have a stronger bond by a third-party than with their natural parent.

Dr. Brown opined both children would suffer irreparable harm from losing contact with defendant: the older child because the bond was so strong and the younger child, who would sense the loss experienced by the older sibling. The younger child would have a deeper sense of loss when separated from the resource parents and would need therapy. Any loss could be mitigated if defendant maintained a relationship between the younger child and the resource parents or if defendant could maintain contact with the children if adopted by the resource parents.

On cross-examination, Dr. Brown noted defendant told him the positive hair follicle test occurred because she "touched cocaine." When asked whether he believed defendant or thought

that was possible, he stated it "was not [his] field of expertise," but conceded those with bipolar disorder who do not take their medication have a tendency to self-medicate with illicit drugs.

Dr. Brown acknowledged he did not follow-up with information related by the resource mother regarding the children. For example, the older child wets the bed prior to seeing defendant and expressed fear when discussing her. In April 2016, the older child told defendant he wanted to live with his resource mother during this time. Dr. Brown conceded a "primary byproduct of bipolar disorder is a dysregulation of anger and emotion and sleep and so on" and agreed "in the past without medication, [defendant] was probably very horrible"; yet Dr. Brown refuted the future possibilities were governed by this past conduct.

Finally, Dr. Brown agreed his bonding conclusions were based on defendant's assertion she cared for her older child for the first five years; Dr. Brown admitted he had no knowledge the child was in the custody of defendant's aunt.

The children's resource parent discussed the children's status. She agreed she would allow defendant future contact with the children were she permitted to adopt them. Defendant's counselor stated she consistently attended parenting classes for six months and self-reported maintaining stable housing for three months and employment. The counselor discussed defendant's self-

13

reports, made six months earlier, regarding medication compliance, which were later learned to be inaccurate.

Defendant's former foster mother discussed their past relationship, refuting any claim she asked defendant to leave. She emphasized her willingness to provide help to defendant and the children in the future. The Division's adoption caseworker confirmed defendant was working at an Amazon warehouse and lived in the same residence for the past six months.

Defendant confirmed her sustained housing and current employment. She insisted she remained medication compliant since her younger child was born in 2014, even though she did not always attend the medication monitoring sessions. When confronted, defendant asserted no current need for medication. She described her apartment of nine months, which accommodated the children, and stated she enrolled in a nursing program at Mercer County Community College. Supplemental information showed defendant completed the educational course and was hired as a certified nursing assistant at a nursing home. She currently attended therapy and maintained participation in medication monitoring since December 2015, noting her dosage of Abilify was recently lowered. She expressed love for her children and her intention to provide stable, safe care for them. She continued therapeutic visits.

A-0016-16T1

The judge delivered a comprehensive oral opinion on August 11, 2016. She found the Division established all four prongs of the best interests test, and ordered defendant's parental rights terminated to free the children for adoption. On appeal, defendant argues the findings were not supported by the weight of the evidence. She requests we reverse the guardianship judgment.

The scope of our review of a trial court's decision to terminate parental rights is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We are obliged to accord deference to the trial judge's factual findings, based upon the opportunity of the judge to see and hear the witnesses, as "[p]articular deference is owed to credibility determinations." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 185 (2010); see also N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007); Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). A judgment of a trial judge "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." In re Adoption of a Child by P.F.R., 308 N.J. Super. 250, 255 (App. Div. 1998) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)). Reversal is required only in those circumstances when

the stated findings are "so wide of the mark that a mistake must have been made." M.M., supra, 189 N.J. at 279 (citations omitted).

However, the "traditional scope of review is expanded" when the appellant challenges, in particular, the trial judge's evaluation of the underlying facts and the implications drawn from those facts. Ibid.; see also N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) ("There is an exception to that general rule of deference: Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand the scope of our review" (quoting In re Guardianship of J.T., 269 N.J. Super. 173, 189 (App. Div. 1993))). "Despite such circumstances, deference will still be accorded to the trial judge's findings unless it is determined that they went so wide of the mark that the judge was clearly mistaken." G.L., supra, 191 N.J. at 605. Indeed, this court accords no special deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts[,]" Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), which this court reviews de novo. Dep't of Envtl. Prot. v. Kafil, 395 N.J. Super. 597, 601 (App. Div. 2007).

"The Federal and State Constitutions protect the inviolability of the family unit." In re Adoption of a Child by

W.P. & M.P., 308 N.J. Super. 376, 382 (1998) (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13, 31 L. Ed. 2d 551, 558-59 (1972)), vacated on other grounds, 163 N.J. 158 (2000). Parents hold a constitutionally protected, fundamental liberty interest in raising their biological children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394, 71 L. Ed. 2d 599, 606 (1982). However, government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603, 99 S. Ct. 2493, 2504, 61 L. Ed. 2d 101, 119 (1979) (citing Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S. Ct. 1526, 1540, 32 L. Ed. 2d 15, 33 (1972)). The State, as parens patriae, may sever the parent-child relationship to protect the child from serious physical and emotional injury. W.P. & M.P., supra, 308 N.J. Super. at 382.

When a child's biological parent resists termination of parental rights, the court must determine whether the parent can raise the child without causing harm. In re Guardianship of J.C., 129 N.J. 1, 10 (1992). The cornerstone of our inquiry is not whether the parent is fit, but whether the parent can "cease causing their child harm" and become fit to assume the parental role within time to meet the child's needs. Ibid. "The analysis . . . entails strict standards to protect the statutory and

A-0016-16T1

constitutional rights of the natural parents." Ibid. "The burden rests on the party seeking to terminate parental rights 'to demonstrate by clear and convincing evidence' that risk of 'serious and lasting [future] harm to the child' is sufficiently great as to require severance of the parental ties." W.P. & M.P., supra, 308 N.J. Super. at 383 (quoting J.C., supra, 129 N.J. at 10).

Examination "focuses upon what course serves the 'best interests' of the child." Ibid.; see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 612 (1986) (requiring the State to satisfy the "best interests of the child" test by clear and convincing evidence before termination of parental rights can be ordered). More specifically, the four-pronged statutory test requires the Division to prove:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the

court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).]

These standards are neither discrete nor separate; they overlap to provide a composite picture of what may be necessary to advance the best interests of the children. I.S., supra, 202 N.J. at 167; K.H.O., supra, 161 N.J. at 348 (stating the statute's four parts "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.").

"The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." K.H.O., supra, 161 N.J. at 348 (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

> Clear-and-convincing evidence is "that which 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction without hesitancy of the precise facts in issue.'"
>
> [In re Seaman, 133 N.J. 67, 74 (1993) (alterations in original) (quoting In re

Boardwalk Regency Casino License Applicant, 180 N.J. Super. 324, 339 (App. Div. 1981), modified, 90 N.J. 361 (1982)).]

We turn to defendant's arguments, challenging the weight of the Division's evidence and whether it satisfactorily met this high burden. Defendant maintains the judge erred when concluding the first prong was satisfied because "injury to children need not be physical to give rise to State termination of biological parent-child relationships." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing J.C., supra, 129 N.J. at 18). Emphasizing there is no proof of physical harm to either child and the children were not subjected to her past unstable housing, defendant believes she fully refuted the Division's evidence directed to prove prong one. We are not persuaded.

It is not necessary to wait "until a child is actually irreparably impaired by parental inattention or neglect" in order to find child harm. In Guardianship of D.M.H., 161 N.J. 365, 383 (1999). The Supreme Court has instructed "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." K.L.F., supra, 129 N.J. at 44 (citing J.C., supra, 129 N.J. at 18). "The child's right to a permanent home has gained increasing prominence" in this analysis. N.J. Div. of Youth &

Family Servs. v. P.P., 180 N.J. 494, 505 (2004) (quoting In re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404 (1999)). "Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

Accordingly, when reviewing the evidence, a trial judge should not focus "on a single or isolated . . . or past harm"; instead, the judge must consider "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., supra, 161 N.J. at 348. Indeed, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of [a] child." D.M.H., supra, 161 N.J. at 379.

We applaud defendant's efforts made immediately prior to trial: she continued her education in the nursing profession; she had not moved for nine months; and retained employment. We wish defendant continued success in maintaining milestones as she conquers the difficulties presented by her illness. If these six months were isolated as the basis for review, our conclusions might be different. However, we cannot ignore the totality of the evidence. Defendant's successes as demonstrated at trial remain

21

fragile, particularly in light of her sporadic, inconsistent history of repeated compliance and relapse.

The Division's involvement with the family began in 2010. The trial judge correctly considered defendant's acts and omissions beginning in 2014, rather than emphasizing behaviors during her youth. Since the younger child was born, the evidence reveals defendant's inability to sustain a safe and secure home for the children. She engaged in explosive episodes of anger when things were not as she wished; she rejected assistance from the Division and its providers as working against her. Other behaviors reflected a deterioration of her mental health and her decision-making skills by inconsistently engaging in treatment; rebuffing the importance of counseling, which included an emphasis on medication compliance and monitoring because her claims of consistent medication compliance were untrustworthy; declining services she felt unnecessary or restrictive; allowing services to terminate because of excessive absences; rejecting house rules with which she found fault; living in nine different residences during the prior two-year period; withholding information from the Division and even her own evaluator, including at times her whereabouts; engaging in criminal conduct, which resulted in incarceration; and dabbling in cocaine use.

22

The judge concluded the evidence showed a very high risk of harm to the children as a result of the parental relationship, before and after the Division obtained custody.  See M.M., supra, 189 N.J. at 290.   The judge emphasized defendant's lack of demonstrated stability, essential for the children's security. She found the Division demonstrated erratic, unpredictable, and dangerous behaviors by defendant when she was not engaged in treatment.  Even defendant's expert conceded repeated relapses by sufferers of bipolar disorder were common and expected.  The lack of a safe, permanent home constitutes "harm" under the best interests standard.  D.M.H., supra, 161 N.J. at 383; J.C. supra, 129 N.J. at 26 (holding as an underlying concern a child's need for permanency within a reasonable amount of time).  Also, the judge acknowledged defendant's conduct during these periods was "probably very horrible."  See N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 439-40 (App. Div. 2001) (noting mental illness of a parent may create an environment where the parent is incapable of safely caring for the children), certif. denied, 171 N.J. 44 (2002).

Defendant's syllogism suggesting a finding of harm because of her illness opens the possibility for all bipolar parents to be considered unfit is rejected.  The trial judge very precisely found it was not defendant's mental disorder itself, but her

failure to engage in necessary treatment consistently, which satisfied prong one.

Dr. Brown's hypothesis, which blamed the Division for triggering defendant's relapses, is also rejected. The record shows when an extended visit was cancelled because the children were ill, defendant's disappointment triggered her relapse. However, life is filled with disappointments, large and small. If similar disappointments are sufficient to trigger defendant's relapse, serious exposure to potential harm is present.

The evidence further satisfies the related prong two. Defendant's repeated relapses, caused by her inability or unwillingness to consistently address and treat her mental illness, constituted harm. These relapses, which went unabated, posed a risk to the safety and security of the children. See Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450-51 (2012). The sustained success immediately before trial was the longest experienced by defendant. The judge considered this and concluded six months were insufficient to show defendant had conquered the impediments to reunification and would consistently follow through, placing the children's needs first. The judge, crediting Dr. Becker-Mattes' evaluation, concluded defendant "over[]estimated her capabilities and minimized her limitations."

24

A myriad of efforts, extended by the Division to achieve reunification, was recounted by the trial judge. The Division provided "coordinated" services, which had a "realistic potential" of success. N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002). The judge acknowledged programs which defendant completed. She also discussed those not completed because of defendant's unwillingness to cooperate, which impeded achieving reliability as an independent caregiver. The judge rejected Dr. Brown's suggestion the Division's efforts were not addressed to reunification or the services were insufficient. Reasonable efforts to locate family members as viable placements for the children was also proven. See N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 582 (App. Div. 2011) (commenting the Division is not obligated "to search the fifty states or even the twenty-one counties to identify [relatives] . . . .").

We defer to these findings grounded on unrefuted evidence in the record. We also reject defendant's argument the Division was required to re-investigate and re-assess family members determined to be unqualified caregivers.

The final prong demands proof "[t]ermination of parental rights will not do more harm than good" to the affected children. N.J.S.A. 30:4C-15.1(a)(4). This "fail-safe" guards against

termination of rights where a judge concludes termination is inappropriate, even in light of proof of the first three prongs. G.L., supra, 191 N.J. at 609.

Defendant relies on the experts' observation she is an affectionate mother, who has a bond with her children. She argues insufficient weight was given to Dr. Brown's opinion the older child will suffer irreparable harm if the bond with his mother is permanently severed.

The bonding experts were at odds on this point. The trial judge credited the analysis of the Division's expert, Dr. Becker-Mattes, finding Dr. Brown's opinion was "not in accord with the overwhelming credible evidence offered in this trial . . . to the contrary." Further, she found Dr. Brown's conclusion of defendant's mental stability was internally inconsistent with his suggested expectation she would experience relapses, as well as the record showing a pattern of "primarily noncompliance." The judge also discredited Dr. Brown's opinion because it heavily relied on defendant's clinical interview statements rather than "the voluminous information chronicled in her long history with the Division."

The judge evaluated the evidence of the stress experienced by the children, before, during, and after visits. She noted Dr. Brown admitted the younger child's stronger bond rests with the

resource parents, who are the only caregivers the child has known. Further, the older child considers them as psychological parents and had the fortitude to reveal to his resource mother the desire to stay in their care. Both experts acknowledged the safe and secure bond between the children and their nurturing resource parents, who can aid them to overcome a loss. The resource parents readily recognized the children's needs and were committed to facilitating those needs.

We defer to the judge's factual findings, based on her ability to hear the witnesses and watch their testimony. Her thorough findings fulfill her "responsibility to make sense of the competing views presented by the experts and to assure a complete and balanced presentation of all relevant and material evidence sufficient to enable it to make a sound determination of the child's best interests." K.L.F., supra, 129 N.J. at 44.

In light of our review, we conclude Judge Audrey P. Blackburn's judgment terminating defendant's parental rights and awarding guardianship to facilitate adoption of the children by their resource parents is amply supported by the evidence and will not be disturbed. Judge Blackburn properly weighed the testimony of each witness, as well as the other evidence to determine the children's best interests, which she concluded were stability and

permanency. <u>J.C.</u>, <u>supra</u>, 129 <u>N.J.</u> at 26. We discern no error in applying the facts to the applicable law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0016-16T1