**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5437-14T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

P.D.,

    Defendant-Appellant,

and

A.W.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP OF
S.D.,

    Minor.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **October 20, 2017** |
| **APPELLATE DIVISION** |

Argued September 19, 2017 — Decided October 20, 2017

Before Judges Yannotti, Leone and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0082-14.

Patricia Nichols, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Nichols, of counsel and on the briefs).

Elliott M. Siebers, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Siebers, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Devlin, of counsel and on the brief).

The opinion of the court was delivered by

YANNOTTI, P.J.A.D.

P.D. appeals from a judgment entered by the Family Part on July 22, 2015, which terminated his parental rights to the minor child S.D.[1] On appeal, P.D. argues that the judgment should be reversed because the Division of Child Protection and Permanency (Division) and the trial court failed to comply with the Vienna Convention on Consular Relations (VCCR), April 24, 1963, 21 U.S.T. 77; he was denied due process and the right to effective assistance of counsel; and the Division failed to establish with clear and convincing evidence the criteria for termination of his parental rights. We reject these arguments and affirm the trial court's judgment.

---

[1] In accordance with Rule 1:38-3(d), we use initials to identify the parties and others involved in this matter.

We briefly summarize the salient facts and procedural history. In August 2006, A.W. gave birth to S.D. and several days later, the Division received a report that the child was living in an apartment where certain individuals were using alcohol and drugs. Two days later, the hospital where S.D. was born reported to the Division that S.D. had tested positive for cocaine. The Division investigated the report and substantiated physical abuse by A.W., based upon the child's positive drug test.

On August 25, 2006, the Division removed S.D. from A.W.'s care on an emergent basis without a court order and placed the child in a resource home.[2] Thereafter, the Division filed a verified complaint in the Family Part, seeking care, custody, and supervision of S.D., which the court granted. In September 2006, A.W. stipulated that she had abused or neglected the child. Several days later, the Division placed S.D. in the care of K.A., a maternal relative, and her husband, R.A.

At his first court appearance in August 2006, P.D. disputed paternity of S.D. Tests confirmed, however, that P.D. was the child's biological father. P.D. did not offer himself as a

---

[2] The child's removal was authorized by the Dodd Act, which as amended is codified at N.J.S.A. 9:6-8.21 to -8.82. See N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

placement for the child at that time, but the Division provided him with supervised visitation. Initially, P.D.'s visitation took place at the resource home, but in January 2007, the visits were supervised at the Division's office due to an incident between the biological parents and the resource parents. The Division later returned the child to A.W.'s physical custody, but remained involved with the family.

In March 2007, the Family Part judge entered an order, which precluded P.D. from having any contact with S.D. until he complied with a required psychological evaluation and substance-abuse assessment. P.D. later participated in a psychological evaluation. In addition, between May and August 2007, P.D. attended a substance abuse program.

P.D. stopped attending the program because he was charged with a violation of probation. He had been serving a probationary term due to a conviction in 2006 on drug charges. P.D. also has a history of domestic violence against A.W. and another woman, C.F., whom he later married.

In January 2008, the trial court dismissed the abuse or neglect proceedings without making any findings concerning P.D. The court's order stated that A.W. and P.D. shared legal custody of S.D., and A.W. would have physical custody of the child. At some point, P.D. was charged with aggravated assault. He pled

guilty to an offense and the court sentenced him to a three-year prison term, beginning in March 2008. In December 2008, P.D. was deported to his home country of Cape Verde, off the coast of Africa.

Several years later, in April 2012, the Division received a report of domestic violence involving A.W. and her paramour, J.G. S.D. was then five years old. The Division investigated the report and substantiated A.W. for neglect. In July 2012, the Division filed a complaint in the Family Part, seeking care and supervision of S.D., and the court granted the application. In August 2012, the Division informed P.D. that it was again involved with the family.

In October 2012, the Division filed another complaint for care and supervision of S.D., and sought the issuance of restraints against J.G. The court ordered the Division to take custody of S.D. Due to her drug use, A.W. stipulated to abuse or neglect of S.D. In November 2012, the Division again placed S.D. with K.A. and R.A., and the Division informed P.D. of the child's placement.

The Division considered P.D. as a possible placement for the child, but it had difficulty assessing P.D. and his living situation because he was living in Cape Verde. The Division referred the matter for an international home study, which was

completed in November 2013. The Division found the report inadequate because it did not address concerns it had regarding P.D.'s criminal history. The report did not recommend S.D.'s placement with P.D.

In 2012 and 2013, the Division considered placing the child with P.D.'s relatives in Massachusetts. The Division ruled out these placements because it believed it was in the child's best interests to remain in her current resource home. In addition, one of the paternal relatives did not have the resources to care for the child.

In January 2014, the trial court approved the Division's permanency plan for termination of P.D. and A.W.'s parental rights followed by adoption. In March 2014, the Division filed its complaint for guardianship of S.D., and the court entered an order terminating the abuse or neglect proceedings, again without any findings concerning P.D. In December 2014, A.W. made an identified surrender of her parental rights to K.A. and R.A.[3]

In June 2015, the Family Part judge conducted a trial on the Division's complaint. At the trial, the Division presented testimony from its caseworker Priscilla Ortiz and Dr. Elayne

---

[3] We note that K.A. and R.A. later separated but the Division and K.A. remain committed to K.A.'s adoption of the child.

Weitz, who was qualified as an expert in the field of psychology.

P.D. was in Cape Verde at the time of the trial and he did not participate in the first day of trial.[4] On the second day of the trial, P.D. participated by phone and provided sworn testimony. He opposed the termination of his parental rights. He testified that he wanted S.D. sent to Cape Verde to live with him until she reached high-school age.

On July 22, 2015, the judge filed a written opinion in which he found that the Division had established by clear and convincing evidence all of the criteria for termination of P.D.'s parental rights in N.J.S.A. 30:4C-15.1(a). The judge determined that P.D. had harmed S.D. because he had been absent during most of S.D.'s life, and he failed to take any steps to assume a parental role for the child.

In his opinion, the judge noted that after 2008, P.D. failed to maintain contact with S.D., and he lacked knowledge of essential facts about her, including her current grade in school. The judge also noted that P.D. did not appear by phone

---

[4] P.D. asked the court to allow him to participate in the trial by video-conferencing, but he failed to provide the court with the necessary technical information. P.D.'s attorney advised the trial judge that if P.D. could not participate by video-conferencing, the plan was to have him participate telephonically. The judge then placed a telephone call to P.D., but he failed to answer.

for the first day of trial, and he did not acknowledge the child's psychological needs.

The judge also observed that P.D. had not complied with any of the recommendations that the Division made "to remedy the fact that he is a virtual stranger to his child." The judge rejected P.D.'s claim that S.D. should be sent to live with him in Cape Verde. The judge wrote that "[t]o remove the child from her current placement and move her to another country to live with a virtual stranger would cause severe and enduring harm."

In addition, the judge found that P.D. was unwilling or unable to eliminate the harm facing S.D. because he had not maintained contact with his daughter since 2008. P.D. also had no long-term plan for the child, since he intended to raise her only until she reached high-school age. Finally, the judge relied upon Dr. Weitz's testimony to conclude that separating S.D. from her resource parent would cause her serious and enduring emotional and psychological harm, which P.D. would not be able to ameliorate.

The judge memorialized his decision in an order dated July 22, 2015, terminating P.D.'s parental rights. Thereafter, P.D. filed a notice of appeal from the court's July 22, 2015 order. He also filed a motion for leave to file an appeal as within time from certain orders entered by the trial court in the abuse

or neglect proceedings, and a motion to consolidate that appeal with this case. We denied the motions.

We also denied P.D.'s motion to supplement the record on appeal in the guardianship case with transcripts of the abuse or neglect proceedings. P.D. filed a petition for certification, seeking review by the Supreme Court of our rulings on these motions. The Court denied the petition. Div. of Child Prot. & Perm. v. P.D., 227 N.J. 248 (2015).

## II.

We first consider P.D.'s argument, raised for the first time on appeal, that the guardianship judgment should be vacated because the Division and the trial court failed to provide notice of the 2012 abuse or neglect proceedings to the Cape Verde consulate, which P.D. argues was required by the VCCR. He also contends he was denied due process of law because he had no legal representation in the 2012 abuse or neglect proceedings, which allegedly had an adverse effect upon his rights in the guardianship action.

"The VCCR is a binding multi-lateral treaty to which over 160 nations are parties." State v. Jang, 359 N.J. Super. 85, 91 (App. Div.), certif. denied, 177 N.J. 492 (2003). The VCCR "was drafted in 1963 with the purpose, evident in its preamble, of 'contribut[ing] to the development of friendly relations among

nations, irrespective of their differing constitutional and social systems.'" Sanchez-Llamas v. Oregon, 548 U.S. 331, 337, 126 S. Ct. 2669, 2674, 165 L. Ed. 2d 557, 571 (2006) (quoting VCCR, supra, 21 U.S.T. at 79) (alteration in original). The VCCR addresses the functions of a consular post established by the nation sending the consul (the sending State) in the nation receiving the consul (the receiving State). See VCCR, supra, 21 U.S.T. at 82. Both the United States and Cape Verde are signatories to the VCCR.

The Supreme Court of the United States has not determined whether the VCCR is "self-executing" in the sense that it creates individual rights that are judicially enforceable. Sanchez-Llamas, supra, 548 U.S. at 337, 126 S. Ct. at 2674, 165 L. Ed. 2d at 571 (assuming for purposes of argument that the VCCR created judicially-enforceable rights, and holding that suppression of evidence in a criminal proceeding would not be an appropriate remedy for violation of Article 36 of the VCCR). We will assume for purposes of our decision that the VCCR creates individual rights that may be enforced in court.

On appeal, P.D. relies upon Article 37 of the VCCR, which requires a receiving State (in this case, the United States), to provide information regarding guardianships involving any "national of the sending State" (in this case, Cape Verde). P.D.

10

argues that the VCCR required the Division and/or the court to notify the Cape Verde consulate about the 2012 abuse or neglect proceedings because S.D. allegedly has dual citizenship in the United States and Cape Verde.[5]

Article 37 of the VCCR provides, in pertinent part:

> If the relevant information is available to the competent authorities of the receiving State, such authorities shall have the duty:
>
> . . . .
>
> (b) to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State. The giving of this information shall, however, be without prejudice to the operation of the laws and regulations of the receiving State concerning such appointments;
>
> [VCCR, supra, 21 U.S.T. at 102.]

The purpose of such notice is to allow the consulate to determine whether to provide assistance to its citizen. Under Article 5 of the VCCR, such assistance could include:

> (a) protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies

---

[5] P.D. testified at trial that Cape Verde would grant S.D. citizenship because he is a citizen there. We need not decide whether P.D.'s assertion is correct. Even assuming Cape Verde would grant citizenship to S.D., it is undisputed that she is also a citizen of the United States.

corporate, within the limits permitted by international law;

. . . .

(e) helping and assisting nationals, both individuals and bodies corporate, of the sending State;

. . . .

(h) safeguarding, within the limits imposed by the laws and regulations of the receiving State, the interests of minors and other persons lacking full capacity who are nationals of the sending State, particularly where any guardianship or trusteeship is required with respect to such persons;

(i) subject to the practices and procedures obtaining in the receiving State, representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests;

(j) transmitting judicial and extra-judicial documents or executing letters rogatory or commissions to take evidence for the courts of the sending State in accordance with international agreements in force or, in the absence of such international agreements, in any other manner compatible with the laws and regulations of the receiving State;

. . . .

(m)  performing    any    other    functions
entrusted to a consular post by the sending
State which are not prohibited by the laws
and regulations of the receiving State or to
which no objection is taken by the receiving
State  or  which  are  referred  to  in  the
international  agreements  in  force  between
the sending State and the receiving State.

[Id. at 82-85.]

The United States Department of State has issued guidance on consular notification and access, and has stated that the Article 37 notice requirements do not apply when the minor involved in the proceedings is an American citizen, even if the minor holds dual citizenship from another nation. United States State Dep't Manual on Consular Notification and Access, at 14, https://travel.state.gov/content/travel/en/consularnotification. html (last visited October 10, 2017); Robert G. Spector, The Vienna Convention on Consular Relations:  The Most Neglected Provision of Int'l Family Law, 22 Transnat'l Law & Contemp. Problems 643, 649-50 (Fall 2013). We see no reason to interpret the VCCR in a manner contrary to the interpretation reflected in the State Department's guidance.

Indeed, courts in other jurisdictions have relied upon the State Department's guidance on this issue. See In re R.J., 381 S.W.3d 619, 625 (Tex. App. 2012) (noting that under the VCCR, "the Department was required to notify the Mexican consulate of the parental termination suit only if the child that is the

13

subject of the suit was a Mexican national," and there was no evidence that children were Mexican nationals); Melendez v. State, 4 S.W.3d 437, 441-42 (Tex. App. 1999) ("Because there is no evidence in the record that Melendez is not a United States citizen, we cannot conclude that the [VCCR] notice provisions were triggered in the first instance."). We therefore conclude that the VCCR did not require consular notice of the 2012 abuse or neglect proceedings involving S.D.

However, even if the VCCR required notice of those proceedings, P.D. has not shown that he was prejudiced by the lack of such notice. See In re Adoption of Peggy, 767 N.E.2d 29, 38 n.12 (Mass.) (noting that consular notice regarding custody proceedings may have been appropriate, but the consulate was aware of the proceedings, and did not assert an interest in the case; therefore, the authorities' failure to provide notice did not change the outcome of the case), cert. denied, sub nom. S.T. v. Mass. Dept. of Soc. Servs., 537 U.S. 1020, 123 S. Ct. 540, 154 L. Ed. 2d 428 (2002); In re Antonio O., 784 N.W.2d 457, 466-67 (Neb. Ct. App. 2010) (finding that failure to comply with VCCR caused no prejudice and did not deprive father of due process).

We note that the trial court appointed a law guardian to represent S.D. in the abuse or neglect proceedings. N.J.S.A.

14

9:6-8.23. Thus, S.D. had legal representation in those proceedings, notwithstanding the absence of consular notice. Furthermore, P.D. presented no evidence showing what additional action, if any, the Cape Verde consulate would have taken on S.D.'s behalf, if it had been notified of the proceedings.

P.D. further argues that he was denied due process in the 2012 abuse or neglect proceedings as a result of the lack of consular notice, which he claims adversely affected his rights in the guardianship action. The record shows, however, that the Division notified P.D. of the 2012 proceedings. During those proceedings, P.D. was living freely in Cape Verde. In addition, P.D.'s wife is a United States citizen who works for the United States Department of State in Cape Verde, and his father works for the Cape Verde government. Therefore, P.D. could have sought assistance from the Cape Verde consulate on behalf of S.D. or himself.

Moreover, P.D. could have obtained counsel to represent his interests in the abuse or neglect proceedings. The record also reflects that the Division provided P.D. with the paperwork necessary to obtain assigned counsel for those proceedings. P.D. did not, however, return the completed application to the Division until October 2013. Thereafter, counsel was appointed for P.D., and he had legal representation at the December 23,

2014 hearing on the Division's permanency plan. P.D. also was represented by counsel throughout the subsequent guardianship proceedings.

Thus, the record shows that P.D. was afforded notice and the opportunity to be heard in both proceedings. Furthermore, P.D. also has not shown any prejudice in the guardianship proceeding resulting from the abuse or neglect matter in which the judge made no findings regarding P.D. We therefore reject P.D.'s contention that he was denied due process of law due to the lack of assistance from the Cape Verde government or the Cape Verde consulate.

### III.

Next, P.D. argues that he was denied the effective assistance of counsel in the abuse or neglect and guardianship proceedings. He asserts that the guardianship judgment should be reversed or, at the very least, the matter remanded to the trial court for an evidentiary hearing on his ineffective-assistance-of-counsel claims.

We note that a claim of ineffective assistance of counsel in an abuse or neglect or a guardianship proceeding must be raised in a direct appeal from the final judgment in those matters. R. 5:12-7 ("Claims of ineffective assistance of counsel shall be raised exclusively on direct appeal of a final judgment

or order."); N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 311 (2007). P.D. did not file a timely appeal from the final judgment entered in the abuse or neglect proceedings.

Moreover, we denied P.D.'s motion for leave to file an appeal in the abuse or neglect matter nunc pro tunc. We also denied P.D.'s motion to supplement the record on appeal in this case to include portions of the record in the abuse or neglect matter. Accordingly, we will only address P.D.'s claim that he was denied the effective assistance of counsel in the guardianship action.

To establish the ineffective assistance of counsel, P.D. must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984), and adopted by our Supreme Court for ineffective-assistance-of-counsel claims asserted in matters involving the termination of parental rights. B.R., supra, 192 at 308-09.

Therefore, P.D. first must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness." Strickland, supra, 466 U.S. at 688, 690, 104 S. Ct. at 2064, 2066, 80 L. Ed. 2d at 693, 695. He also must establish that he was prejudiced by showing that there is a "reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

We are convinced that the existing record is sufficient to resolve P.D.'s claims, and a remand to the trial court is not necessary. We are also convinced that P.D.'s claims of ineffective assistance of counsel fail because he has not established both prongs of the Strickland test.

P.D. claims he was denied the effective assistance of counsel because his attorney allegedly lacked sufficient knowledge of the VCCR. Even if his attorney was not sufficiently familiar with the VCCR, P.D. has not shown he was prejudiced thereby. As we have explained, consular notice under the VCCR was not required with regard to the abuse or neglect proceedings involving S.D. because she is an American citizen. The same is true regarding the guardianship action.

P.D. also claims his attorney should have sought dismissal of the Division's guardianship complaint based on N.J.S.A. 30:4C-15.2, which provides that "the final hearing for guardianship shall be held within three months from the date the petition is filed[.]" P.D. has not shown, however, that he was prejudiced by counsel's failure to seek dismissal of the complaint pursuant to the statute.

Even if the court had dismissed the petition on this basis, the dismissal would have been without prejudice and the Division could have filed a new complaint seeking to terminate P.D.'s parental rights to S.D. Thus, P.D. has not shown that the result here would have been different if his attorney had filed a motion to dismiss the Division's complaint pursuant to N.J.S.A. 30:4C-15.2.

P.D. further alleges that his attorney was ineffective because he did not object when Dr. Weitz, the Division's expert, interviewed him on the telephone. P.D. also claims his attorney was ineffective because he failed to object to Dr. Weitz's testimony because she did not perform an in-person psychological evaluation of him.

These arguments are entirely without merit. Psychological evaluations are often performed in termination-of-parental-rights litigation. Because P.D. had been deported and was living in Cape Verde, Dr. Weitz could only speak with him on the phone. If P.D.'s counsel had objected to the call, the court would have found no merit in the objection.

Moreover, P.D.'s counsel could not have objected to Dr. Weitz's report on the ground that she had not performed a psychological evaluation of him. There was no basis for such an objection. At trial, Dr. Weitz testified that she could not give

an opinion on P.D.'s fitness as a parent because she had not been able to perform a psychological evaluation of him.

P.D. also claims his attorney was ineffective because he did not object to the introduction of evidence regarding his criminal record. He contends his attorney should have insisted that the State present certified copies of documents pertaining to his criminal convictions. Even if P.D.'s attorney erred by failing to object on this basis, P.D. has not shown that he was prejudiced by the error.

P.D. does not dispute the accuracy of the facts presented concerning his criminal record. Indeed, at trial, P.D. acknowledged his prior conviction on a drug charge, the imposition of a probationary term for that conviction, his violation of probation, the charge of aggravated assault, and his subsequent incarceration.

In addition, P.D. alleges his attorney was ineffective because he allegedly provided lackluster opening and closing statements. He also alleges his attorney did not sufficiently challenge the Division's evidence. The record does not support these claims. The record shows that defense counsel worked diligently on P.D.'s behalf and provided strong advocacy for him. P.D. has not shown that he was prejudiced by his attorney's opening and closing statements. He also has not established that

the result in this matter would have been different if his attorney had been more forceful in challenging the Division's evidence.

We therefore conclude that P.D. has not established that he was denied the effective assistance of counsel in the guardianship proceedings.

IV.

P.D. argues that the guardianship judgment should be reversed because the trial judge's findings of fact are not supported by the record. He contends the Division failed to present clear and convincing evidence establishing all four prongs of the test for termination of parental rights.

The scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

Factual findings of the Family Part "are entitled to considerable deference." D.W. v. R.W., 212 N.J. 232, 245 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). However, we

give no "special deference" to the court's "interpretation of the law." Ibid. (citing N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010)).

The Division may initiate a petition to terminate parental rights in the "best interests of the child" and the petition may be granted if the Division establishes the criteria for termination of parental rights established in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. In re Guardianship of K.L.F., 129 N.J. 32, 38 (1992) (citing In re J.C., 129 N.J. 1, 10-11 (1992)).

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

On appeal, P.D. argues that the judge erred by finding that the Division established prong one of the best interests test, which requires the Division to show that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). P.D. asserts that he never abused or neglected S.D.

We note that "injury to children need not be physical to give rise to State termination of biological parent-child

relationships. Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." K.L.F., supra, 129 N.J. at 44. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999).

The trial evidence shows that P.D. made no effort to maintain a relationship with S.D. after he was incarcerated in March 2008 and deported in December of that year. The record supports the judge's finding that P.D. essentially failed to maintain contact with S.D. after 2008, lacked knowledge of basic facts about her, and failed to acknowledge that she had psychological needs. The evidence therefore supports the judge's determination that S.D.'s safety, health or development have been harmed by her relationship with P.D.

P.D. next argues that the evidence does not support the judge's finding that the Division established prong two of the best interests test. This prong requires the Division to establish that "[t]he parent is unable or unwilling to eliminate the harm facing the child or is unable or unwilling to provide a

23

safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

The record shows that P.D. failed to take steps to establish communication between himself and S.D. The record also shows that P.D. could not provide S.D. with a safe and stable home because he failed to acknowledge S.D.'s emotional needs and he did not recognize the possibility that she would require psychological counseling if sent to live with him in Cape Verde. Furthermore, Dr. Weitz's unrebutted testimony established that the child would suffer severe and enduring harm if she were removed from her resource parent and placed with P.D. There is sufficient credible evidence in the record to support the judge's finding on prong two.

P.D. also contends the Division failed to establish prong three of the test for terminating parental rights. That prong requires the Division to show that it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home, and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). P.D. argues that the Division failed to make reasonable efforts towards reunification.

"The diligence of [the Division]'s efforts on behalf of a parent is not measured by their success." DMH, supra, 161 N.J. at 393. Therefore, a parent's failure to become an adequate caretaker for a child "is not determinative of the sufficiency of [the Division]'s efforts at family reunification[,]" which "must be assessed against the standard of adequacy in light of all the circumstances of a given case." Ibid.

As noted previously, the Division took custody of S.D. in October 2012, when she was six years old. At that time, S.D. essentially had no relationship with P.D. He had not seen her since March 2008, when she was eighteen months old. The child's age also made it difficult for the Division to establish communications with P.D. In addition, the evidence shows that S.D. did not want to have any communications with P.D.

The trial court initially ordered the Division to pursue phone contact, but it later ordered the Division to have P.D. communicate with S.D. in writing. The Division encouraged P.D. to send S.D. cards, letters, or gifts, but he declined to do so, apparently believing that it would be a waste of time and the resource parents were brainwashing the child. When S.D. sent two e-mails to P.D., he only answered one of those messages. He refused to answer the second e-mail, because he believed the resource parent had written that message.

We therefore conclude that there is sufficient credible evidence in the record to support the judge's finding that the Division made reasonable efforts to achieve reunification. The record supports the judge's determination that the Division established prong three.

P.D. further argues that the Division failed to establish prong four of the best interests test. That prong requires the Division to show that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., supra, 161 N.J. at 355.

Therefore, the court must balance the relationships of the biological parent and the child, and the resource parent and the child, and determine whether the child will suffer greater harm from terminating the child's ties with the biological parent than from permanent disruption of the child's relationship with the resource parent. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002).

Here, the judge found that termination of P.D.'s parental rights would not do more harm than good. The judge pointed out that P.D. was a virtual stranger to S.D. The judge found that

P.D. had no bond with S.D. and had "in essence abandoned the child to the care of others." The judge noted that Dr. Weitz had testified that the child would suffer severe and enduring harm if she were removed from her resource parent, and P.D. could not mitigate that harm. Dr. Weitz further testified S.D. would not suffer any harm if P.D.'s parental rights are terminated. The judge accepted Dr. Weitz's testimony, which was unrebutted.

In addition, the judge noted that P.D. only planned to raise S.D. until she reached high-school age. The judge concluded that P.D. had "not taken affirmative steps" to show that he wanted to parent S.D. The judge found that "[t]he child's right to a permanent, safe and stable home must prevail" over P.D.'s desire for reunification.

On appeal, P.D. argues that the record does not support the judge's findings. He contends the judge erred by accepting Dr. Weitz's testimony because the doctor never evaluated him or witnessed any interaction between him and S.D. He further argues that all doubts must be resolved in favor of maintaining his parental rights, and the record lacks any analysis of the deleterious effects adoption would have on the child.

We are convinced that these arguments are entirely without merit. We conclude there is sufficient credible evidence in the record to support the judge's finding that the Division

A-5437-14T4

established that termination of P.D.'s parental rights will not cause more harm than good.

We have considered P.D.'s other contentions, including his argument that the trial judge's opinion lacks necessary findings of fact and conclusions of law, and his contention that the evidence shows he did not abandon his daughter within the meaning of N.J.S.A. 30:4C-15(e) and N.J.S.A. 30:4C-15.1(b). We are convinced that these arguments are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION