# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1860-19T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.K.,

     Defendant-Appellant,

and

S.C.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.C.,
a minor.

_____

Submitted September 29, 2020 — Decided October 29, 2020

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-0043-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Marc D. Pereira, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant K.K.[1] appeals from the November 8, 2019 judgment of guardianship terminating her parental rights to her son, C.C., born April 2011, entered following a trial. The judgment also terminated the parental rights of C.C.'s father, S.C. However, S.C. did not participate in the underlying litigation and is not appealing the termination. S.C. and defendant, who were never married, have another son, T.C., born June 2007. Defendant also has a third child, a daughter, H.J., born September 2017, from a prior relationship with J.J.

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

Although neither H.J. nor T.C. remain in defendant's care, neither child is the subject of this guardianship judgment.

On appeal, K.K. argues the trial judge's conclusion that the Division of Child Protection and Permanency (Division) "clearly and convincingly" established all four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a) "was erroneous, necessitating reversal of the judgment." She asserts "the record does not support the [judge's] conclusion." The Law Guardian supported termination during the trial and, on appeal, joins the Division in urging us to reject defendant's arguments and affirm. Having considered defendant's arguments in light of the record and applicable legal principles, we affirm.

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause

3

serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." New Jersey Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting New Jersey Div. of Youth & Family Services v. G.L., 191 N.J. 596, 606-07 (2007)). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999) (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

On June 27, 2019, the Division filed a complaint to terminate defendant's parental rights and obtain guardianship of C.C. Some detail regarding the circumstances that led to the filing of the guardianship complaint is required for context. Beginning on December 20, 2017, the Division obtained care and

supervision of all three children because of defendant's failure "to secure appropriate services to assure [their] safety."[2]   An order continuing the Division's care and supervision of the children was entered on January 18, 2018, based on defendant's failure to attend a psychological evaluation and cooperate with all recommended services for the children.  Ultimately, on April 5, 2018, the Division was granted care and supervision as well as custody of C.C., who was later placed in a non-relative resource home with a resource parent who is now committed to adopting him.

The Division's first complaint for care and supervision of the children stemmed from a November 2016 referral from the Lumberton Police Department.  According to a Lumberton detective, defendant reported that T.C. and C.C. were sexually assaulted by defendant's stepfather, with whom they all resided.  Although T.C. initially denied the allegations, he ultimately disclosed that he was touched inappropriately on his private areas by his step-grandfather on multiple occasions.  On the other hand, C.C. repeatedly denied any inappropriate contact, but later admitted that his step-grandfather touched his

---

[2]  The Division's first involvement with the family involved a November 2007 referral that defendant had taken then five-month-old T.C. to the courthouse wearing only a diaper and a T-shirt.  Following an investigation, the case was closed upon a finding that allegations of neglect were unfounded.

private part over his clothing on one occasion. Because of the conflicting accounts provided by the children as well as the results of a polygraph examination administered to the children's step-grandfather, the Burlington County Prosecutor's Office closed the investigation. Additionally, sexual abuse was not established by the Division because the children's step-grandfather was not the children's caretaker.

Nonetheless, the Division provided family preservation services to stabilize the family, including referring defendant for a psychological evaluation and referring the family for counseling as well as trauma focused therapy for the children. The Division also assisted defendant in obtaining temporary housing until she obtained a restraining order against her stepfather that prevented him from returning to the home. In addition, the Division assisted defendant with dental and medical care for the children, as the investigation revealed that, contrary to defendant's claim, T.C. had not received dental care in over three years, C.C. had never seen a dentist, and both children required updated immunization vaccines to avoid disrupting their school attendance. However, despite the Division's efforts, defendant failed to undergo the psychological evaluation, obtain the recommended counseling services for the children, or update C.C.'s immunizations.

In 2017, new allegations arose that defendant's mother had also sexually abused T.C. and C.C., and that T.C. was sexually molesting C.C. On September 16, 2017, T.C. was admitted to Virtua Hospital (Virtua) after being transported there by defendant. T.C. presented with suicidal ideation, auditory hallucinations, and homicidal threats against his siblings. During a psychological evaluation, T.C. revealed a history of sexual abuse by both defendant's stepfather and defendant's mother from he was four to ten-years-old. T.C. also disclosed that he had been sexually abusing C.C., and that C.C. had also been molested by his grandparents. C.C. ultimately acknowledged sexual misconduct by his grandmother. According to C.C., his grandmother would make him and T.C. wear their mother's underwear, would "hump" him and T.C. fully clothed, and would touch T.C.'s private area over his clothing. C.C. also acknowledged that T.C. had threatened to hurt him and their baby sister, H.J., and had threatened to kill him if he told their mother. However, C.C. denied that T.C. ever touched him inappropriately.

During a September 26, 2017 multi-disciplinary team meeting in connection with T.C.'s admission to Virtua, defendant stated that T.C.'s molestation of C.C. began in January 2017, but the Division failed to take any action when she voiced her concerns at that time. However, contrary to

defendant's assertion, defendant initially advised a caseworker on August 28, 2017, that C.C. had disclosed and T.C. had admitted that he came into C.C.'s bedroom in the middle of the night, touched C.C. in his private area and then touched himself under their clothes. C.C. also told defendant that T.C. threatened to kill their then unborn sister if he told anyone. In response to the August 28 disclosure, defendant was instructed by the caseworker to make immediate contact with mobile response services to obtain a mental health evaluation for the boys, but failed to do so and took no action until she transported T.C. to Virtua the following month. After his admission to Virtua, T.C. was ultimately transferred on December 4, 2017, to Legacy Services (Legacy) treatment home and residential facility for long-term psychiatric care in accordance with a civil commitment order.

In early 2018, defendant's failure to engage in services and maintain updated immunizations for C.C. continued. Defendant failed to complete a psychological evaluation for herself or C.C., despite defendant's complaints about C.C.'s defiant behavior,[3] and failed to update C.C.'s immunizations,

---

[3] With the Division's assistance, C.C. was placed in a partial care program on December 20, 2017, but defendant's failure to cooperate with other Division recommendations and court orders prevented C.C. from obtaining comprehensive therapeutic care.

8

despite C.C. being barred from attending school for several days, beginning January 29, 2018, until his immunizations were current.[4] On March 11, 2018, defendant transported C.C. to Lourdes Medical Center for crisis intervention screening because C.C.'s problematic behavior, which mirrored T.C.'s and included violent threats, suicidal ideation, and verbal hostility, was escalating. As a result of the screening, C.C. was deemed a danger to himself, his family, and his community, and was subsequently placed at Fairmount Behavioral Health Center (Fairmount) in Pennsylvania for psychiatric treatment.

On April 5, 2018, when C.C. was scheduled to be discharged from Fairmount, the Division was granted custody, care and supervision of C.C. The Division was also granted continued care and supervision of T.C, who remained at Legacy, and continued care and supervision of H.J., whose physical custody was transferred to her father, J.J. The order was predicated on C.C.'s "significant mental health concerns that have not been sufficiently addressed, [H.J.'s] young age and [defendant's] acknowledgement that she may not be able to safely care

---

[4] Previously, C.C.'s immunizations had been updated in October 2017 with the Division's assistance. Thereafter, defendant failed to ensure that his immunizations remained current.

for [C.C.] and [H.J.]" On May 10, 2018, C.C. was discharged from Fairmount and placed in a resource home where he has remained.

On May 24, 2018, based on defendant's voluntary admission that "she [was] part of a family in need of services" the court maintained jurisdiction over the case under N.J.S.A. 30:4C-12, and continued the Division's custody, care and supervision of C.C.[5] The May 24 order also directed defendant to attend a psychological evaluation on May 31, 2018, and comply with all recommendations. Additionally, defendant was granted weekly supervised visitation with C.C. and provided transportation and bus passes for visits and services.

The May 31 psychological evaluation revealed that defendant had borderline personality disorder, bipolar disorder, type II, a history of unstable and atypical relationships and absence of social supports. Recommendations included a psychiatric evaluation, Dialectical Behavioral Therapy (DBT) comprised of individual and group therapy, trauma-focused therapy, and

---

[5] See New Jersey Div. of Youth & Family Serv. v. N.D., 417 N.J. Super. 96, 109 (App. Div. 2010) (terminating a Title 9 action in the absence of an abuse or neglect finding, but allowing the Division to provide care, custody, and supervision to children in need of services under Title 30, where, as here, the Division concurrently filed a Title 9 and a Title 30 complaint).

parenting services, none of which defendant obtained despite the Division's referrals.[6]

At dispositional hearings conducted on April 26 and May 22, 2019, T.C., who had been discharged from Legacy, was dismissed from the litigation upon his placement with defendant's father, who obtained legal and residential custody pursuant to a June 3, 2019 order entered under an FD docket.[7] H.J. was also dismissed from the litigation and her physical custody was continued with her father, J.J. Only C.C. remained in the Division's custody while the Division continued to address his special needs.

---

[6] Although defendant had initially denied illicit drug use when questioned by caseworkers, after receiving a referral that defendant was using illicit drugs as well as positive drug screens, the Division followed up with her treating doctor. On February 6, 2019, the Division received a letter from defendant's doctor, indicating that defendant had been under his care since May 2016 for adult attention deficit disorder, anxiety, and opioid use issues, and was prescribed Subutex and Adderall, which were consistent with defendant testing positive for amphetamines and buprenorphine during the drug screens.

[7] The FD docket is one "of the many Family Part docket types" and "includes actions for 'non-parent relatives seeking custody, child support and/or visitation regarding minor children.'" B.C. v. New Jersey Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 205 (App. Div. 2017) (quoting R.K. v. D.L., 434 N.J. Super. 113, 131 (App. Div. 2014)).

After C.C. was removed from defendant's custody and discharged from Fairmount, he completed a partial care program and underwent psychiatric and psychological evaluations, which revealed diagnoses of post-traumatic stress disorder (PTSD) with dissociative features, generalized anxiety disorder (GAD), attention deficit hyperactivity disorder (ADHD), unspecified depressive disorder, possible sleep terrors, relationship problems, and related issues.[8] Service recommendations included individual psychotherapy, trauma focused therapy, play therapy, psycho-pharmaceutical treatment, and neurological assessment, all of which he received while placed in the resource home.

Meanwhile, defendant's compliance with services remained inconsistent and, in some instances, nonexistent. In particular, defendant failed to visit C.C. during his ten-week stay at Fairmount, and her subsequent inconsistent visits with C.C. resulted in C.C. experiencing emotional trauma that manifested itself in defiant behavior, enuresis, and encopresis.[9] As a result, defendant's weekly

---

[8] C.C. was also diagnosed with failure to thrive and neonatal abstinence syndrome.

[9] Defendant's visits with T.C. were also inconsistent. Additionally, defendant's failure to participate in T.C.'s treatment required the Division to obtain temporary custody of T.C. on October 1, 2018, in order to consent to T.C.'s continued treatment.

visitation was initially reduced to bi-weekly, and, later changed to therapeutic visitation. Based on defendant's non-compliance with services and the Division's on-going concerns for C.C.'s health and safety, at a permanency hearing conducted on May 22, 2019, the judge determined that the Division's plan for termination of parental rights followed by adoption concurrent with reunification was appropriate.

The ensuing guardianship trial was conducted on November 6 and 8, 2019. At the trial, in addition to the admission into evidence of numerous documentary exhibits, Division caseworker Janine Bartram, as well as experts, Chester Sigafoos, Ph. D., and Brian Eig, Psy. D.,[10] testified for the Division. The judge also conducted an in-camera interview of C.C. Defendant neither attended the trial nor produced any witnesses.[11] Likewise, S.C. failed to appear for trial, and the Division produced an affidavit of diligent inquiry attesting to the fact that from February 2018 to November 2019, all efforts to locate S.C. had been unsuccessful.

---

[10]  Sigafoos and Eig were qualified as experts without objection.

[11]  Defendant also failed to attend a defense expert evaluation scheduled for November 8, 2019, while the trial was ongoing.

During her testimony, in addition to authenticating the Division's records, Bartram detailed the Division's involvement with the family. She recounted the Division's efforts to provide services to defendant and defendant's continuous pattern of outright non-compliance or not following through after initiating the services. She testified that although defendant "completed three [random drug screens] since 2016[,]" the Division referred defendant for a psychiatric evaluation and DBT as well as to a parenting program on "[m]ultiple" occasions, all to no avail despite the Division providing defendant with "a monthly bus pass" for transportation.

Bartram testified further that when C.C. was scheduled to be discharged from Fairmount, the Division obtained custody of him, in part, because defendant "refused to pick him up from the hospital." Further, while C.C. was in the Division's custody, defendant "would frequently cancel," or "not show up after confirming visitation" with C.C. Based on her inconsistency as well as C.C.'s "request[] not to visit with his mother[,]" visitation was changed to therapeutic, which Bartram acknowledged defendant never missed. However, according to Bartram, defendant was "very inappropriate when speaking with C.C." during visits, and "was very dismissive of [C.C.'s] feelings."

Bartram testified that in addition to "mental health concerns for [defendant,]" and "her lack of follow-through with any services[,]" obstacles to reunification included "[l]ack of employment verification[,]" and "[u]nstable housing." According to Bartram, defendant's "last known address" was "a room . . . in Lumberton" that she was "renting . . . from a gentleman" that the Division was unable to assess because caseworkers were "not given access to the home."

Bartram further testified that the Division explored relative placement options for C.C., including the paternal grandfather who resided in Washington, and the maternal grandfather, who had custody of T.C. However, the paternal grandfather withdrew due to serious medical issues, and a psychological and bonding evaluation conducted by Dr. Sigafoos concluded that T.C. and C.C. should not be living together. Additionally, C.C.'s father, S.C., had been living out of state and "missing" since the initial complaint was filed in 2017, and the Division's exhaustive efforts to locate him were unsuccessful.

Bartram testified that C.C. has remained with the same resource parent since his placement and was "really thriving in the home." C.C. had prior familiarity with the family because "[t]he resource mother was a teacher at [C.C.'s] school at the time of the removal." Bartram testified that the resource mother was aware of C.C.'s special needs, including his medical and dental

15

issues, and ensured that he obtained the necessary services to address them. In fact, while in the resource mother's care, C.C. "had multiple teeth pulled and . . . extensive dental work done." Bartram described the resource home as "a loving, safe, happy" and "supportive" environment for C.C., and stated that C.C. has told her "how much he loves being there" and that he wants it to be "his forever home" Bartram testified that the resource parent was advised about the difference between kinship legal guardianship and adoption, and expressed an interest in adopting C.C.

During the judge's interview, C.C. confirmed that he wanted to stay with his resource parent "[f]or the rest of [his] life." He stated that his resource family "love[s]" him, "support[s]" him, "protect[s]" him, and "takes extra good care of [him]" in a way "that [he] did [not] have before." He pointed out that "[he] even ha[d] teeth because when [he] came [his] teeth were rotten." He explained that he "really [did not] like" his mother and he did not "like seeing . . . [his] whole entire family because . . . [of] what they did."[12] In notes he had written about his feelings,[13] C.C. wrote that what he wanted from his mother was for her to

---

[12] C.C. acknowledged his sister's innocence but maintained that he did not want any contact with her either.

[13] C.C.'s notes were introduced by the Law Guardian and admitted into evidence without objection.

A-1860-19T1

"[s]ign the papers, [and] let [him] go," and he "hope[d]" that the judge would agree with him and let him stay in his resource home.

Dr. Sigafoos, an expert in the field of clinical psychology, testified about the psychological evaluation he conducted of C.C. and the bonding evaluation he conducted of C.C. and his brother on May 14, 2019. Sigafoos explained that as a result of "[t]hings [that] happened to [C.C.] early in his life[,]" it was going to "be very, very difficult" for him to "trust . . . anybody." Because of his trust issues, "[C.C.] does not have the coping strategies that a child his age should have[,]" and exhibits other "mental health boundaries." According to Sigafoos, C.C. "volunteered that he trust[ed] his [resource] mother and he felt safe with her." On the other hand, C.C. "did not trust [defendant] nor did he feel safe around her." Likewise, C.C. verbalized that he did not "trust T.C.[,]" and he did not "want to be around T.C." Based on his observations of the interactions between the brothers, Sigafoos concluded there was "no bond between them[,]" and opined that "C.C. and T.C. should not be living together" because it would be "too detrimental to them." Further, Sigafoos opined that removing C.C. from his resource mother would create "another abandonment issue" for a child who already has "multiple issues of abandonment[,]" stemming "from his mother."

A-1860-19T1

Dr. Eig, an expert in the field of clinical and forensic psychology, testified about the psychological and parenting capacity evaluation of defendant, and the bonding evaluation with C.C. that he conducted on August 7, 2019. Eig found defendant to be of average intelligence. He diagnosed her with "bipolar II disorder by history" and "unspecific personality disorder with a number of different traits including paranoid schizotypal[,]" as well as "avoidant and passive-aggressive traits." Eig explained that "passive-aggressive [traits]" involve "resistance, procrastination, not following recommendations or not doing what one is typically told."[14]

Assessing defendant's "cognitive, emotional and behavioral functioning" in relation to her parenting capacity, Eig opined that defendant "has not demonstrated the ability to meet her children's needs in . . . a couple of different areas, particularly, . . . dental neglect, medical neglect[,] and emotional neglect." Regarding her ability to "recognize physically and psychologically hazardous situation[s] and . . . eliminate or at least . . . mitigate potential for harm[,]" Eig determined based on his review of "collateral records" that defendant was unable to protect C.C. from "further harm" and failed to "engage[] in recommendations

---

[14] According to Eig, during the evaluation, defendant also "shared with [him] that she was dependent on opiate medications" since suffering "a stroke in . . . 2006 or 2007."

. . . to mitigate any potential risk for C.C." Regarding her ability to provide guidance to C.C., according to Eig, defendant "has not demonstrated . . . sound reasoning" or good "judgment." Further, defendant neither "demonstrate[d] emotional[]" nor "[residential] stab[ility]."

Based on his evaluation of defendant in relation to C.C.'s special needs, Eig did "not consider [defendant] to be a minimally adequate parent[,]" and "would not support [her] as . . . an independent or sole parent to her children." Eig concluded that "given . . . the nature of [her] personality disorders, . . . specifically the pervasive, enduring[,] . . . inflexible and maladaptive nature of [her] personality pathology," defendant would not be "able to change or improve her parenting capacity appreciably in the foreseeable future[,]" "even if she completed [the recommended services]."

Turning to the bonding evaluation, Eig "did not see any evidence of an attachment" between C.C. and defendant. Eig testified that "[w]hen C.C. entered the [observation] room" where defendant was already seated, "C.C. walked past her, sat on the opposite end of the room and immediately began expressing a lot of negative, biting, caustic comments towards her and pleading and begging for her to sign the papers[,]" referring to "her surrendering her parental rights." Although defendant responded verbally, saying she was "not

going to sign the papers because it [was] a permanent decision and [C.C. was] just angry with [her] now[,]" there was no "emotional reaction" on defendant's part despite C.C.'s "obvious[] distress[]." Based on their interaction, Eig noted "their relationship did not appear to be strong, positive or warm." As a result, Eig opined that C.C. "would be at low risk of severe and enduring psychological and emotional harm if his relationship with his mother was permanently [terminated]."

On the other hand, according to Eig, there was "[a] stark difference" between C.C.'s relationship with his resource mother, as there appeared to be "a warm, positive and strong relationship between the two of them." Eig testified "[t]here was much more tactile contact, [and] physical affection" and "C.C. appeared comfortable with the contact, . . . [and] the closeness." However, "in terms of attachment[,]" while "[i]t appeared secure," given "the way attachment develop[s] and the time that they have spent together," Eig did not observe "an attachment style." As a result, Eig opined that "C.C. would also be at a low risk for suffering severe and enduring psychological and emotional harm if his relationship with his resource parent was permanently ended."

However, while Eig "believe[d] that [the resource parent] would be able to mitigate any . . . potential harm to severing . . . [C.C.'s] relationship . . . with

[defendant,]" he did not believe defendant had the ability to mitigate any harm that C.C. may face if his relationship with the resource parent was terminated "based on [defendant's] lack of following through and engaging in services with her children." Based on the evaluations, Eig's recommendation was that it "would be in [C.C.'s] best interest" to "remain . . . with the current resource parent" as C.C. was "making progress and . . . thriving."

Following the trial, the judge entered a judgment terminating defendant's parental rights and granting guardianship to the Division. In oral decisions placed on the record on November 8 and 14, 2019,[15] the judge found the testimony of "all three [Division] witnesses . . . credible[,]" "concise," and "unequivocal[,]" and made detailed factual findings consistent with their respective testimony and the supporting documentary exhibits. Regarding the child interview, while noting that "the [c]ourt does not let a child make such a momentous decision[,]" the judge found C.C. "articulate" and "intelligent," and considered his strong "preference" to "remain with his [resource mother]" and sever "all ties with his biological family[.]" The judge then applied the governing legal principles to her factual findings and concluded that the

---

[15] The judge placed an abbreviated decision on the record on November 8 so that C.C. would "know what his future [was] as soon as possible." Subsequently, on November 14, the judge placed her "full opinion" on the record.

Division "very clearly . . . met its burden as to all four prongs [of the best interests standard] by clear and convincing evidence."

As to prong one, the judge found that beginning in 2016,

> [a]fter [defendant] reported the [sexual] abuse, which she stated she reported immediately upon learning, [she] failed to obtain assistance or help for C.C. to . . . ameliorate the consequences of the abuse even though the Division offered multiple services for C.C. In addition, she failed to provide dental or medical care for the child.

"[F]ocus[ing] on the cumulative effect . . . over time[,]" the judge determined that C.C.'s health and development was and would continue to be endangered from the parental relationship. See K.H.O., 161 N.J. at 348 ("[N.J.S.A. 30:4C-15.1(a)] requires that the State demonstrate harm to the child by the parent. Harm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship."); In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) ("[I]njury to children need not be physical to give rise to State termination of biological parent-child relationships. Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights.").

As to prong two, the judge determined that defendant "has clearly failed to provide a safe and stable home for C.C.[,]" and "did nothing to alleviate" C.C's multiple mental health "problems by providing . . . mental health care and treatment for C.C." According to the judge, defendant thereby demonstrated her inability or unwillingness "to eliminate the harm to this child[,]" and "[a]ny delay in permanent placement will . . . add to this harm, especially since C.C. clearly wants to remain permanently in the care of his [resource] mother." The judge added that given the length of time C.C. has endured "his foster child status[,]"[16] and the fact that his "current caregiver wishes to adopt him[,]" the "harm attributable to the delay in permanency was significant in this [c]ourt's decision." See K.H.O., 161 N.J. at 352 ("The second prong of the statutory standard relates to parental unfitness[,]" which may "be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." (quoting N.J.S.A. 30:4C-15.1(a)(2))).

_____

[16] Pursuant to N.J.S.A. 30:4C-15(d), the Division may petition for guardianship "where a child has been in placement for more than one year, and the family has failed to remedy the problems that caused placement, despite [the Division's] diligent efforts to assist reunification." K.H.O., 161 N.J. at 358 (citation and quotation marks omitted).

Turning to prong three, after recounting the plethora of services offered by the Division to stabilize and reunify the family, the judge found that defendant "either sporadically attended these services, usually only after repeated attempts to have her attend, or she failed to attend the appointments at . . . all." The judge also considered the Division's unsuccessful "attempts" to place C.C. as "an alternate resolution," and concluded "there [was] no alternative to termination of parental rights." See In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999) ("The diligence of [the Division's] efforts on behalf of a parent is not measured by their success[,]" but "must be assessed against the standard of adequacy in light of all the circumstances of a given case.").

Finally, regarding prong four, the judge considered Eig's unrebutted expert testimony. "Upon balancing C.C.'s relationship with his mother . . . with the relationship with his foster parent[,]" the judge "conclude[d that] termination of this parental relationship will not do more harm than good." See K.H.O., 161 N.J. at 355 ("[T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties[,]" but "whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural

parents than from the permanent disruption of [his] relationship with [his] foster parents.").

The judge "also considered the harm that might befall [C.C.] if his relationship with his . . . siblings [was] permanently severed." However, relying on Sigafoos' expert testimony that C.C.'s relationship with his brother was "not healthy . . . for C.C." and may not be for years, the judge determined that "the harm to [C.C.] by maintaining that relationship [was] far greater than any harm that might befall [C.C.], if any, by terminating" defendant's parental rights. "After considering the abuse suffered by C.C. from his brother and the additional harm caused to C.C., the [c]ourt conclude[d] severance of this relationship [was] in C.C.'s best interest." The judge explained that both C.C. and T.C. "deserv[ed] more than what their natural parents have given them[,]" and were "entitled to permanent placement even if such placement carrie[d] the potential to permanently deprive them of the right to live together as a unit each and every day." See K.H.O., 161 N.J. at 357 ("In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor.").

On appeal, defendant argues the judge's findings as to prongs one and two "are belied by the record." As to prong three, defendant asserts the services offered to her by the Division were "inadequate and instilled self-defeat[,]" and

C.C.'s father, S.C., "was never adequately explored" as an "alternative placement." Regarding prong four, defendant contends "the conclusions made by Dr. Eig, and subsequently the [judge], are contradicted by the evidence of record." We reject defendant's contentions in their entirety.

Our scope of review on appeals from orders terminating parental rights is limited. In such cases, we will generally uphold the trial court's factual findings, so long as they are "supported by adequate, substantial, and credible evidence." New Jersey Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing New Jersey Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Indeed, we must give substantial deference to Family Part judges' special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. Id. at 552-53. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings are "so wholly unsupportable as to result in a denial of justice." New Jersey Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be accorded unless the judge "went so wide of the mark that a mistake must have

been made." New Jersey Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

Guided by these standards, contrary to defendant's contentions, we are satisfied that the judge's factual findings are amply supported by the credible evidence in the record, and her legal conclusions are sound. "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." New Jersey Div. of Youth and Family Services v. F.M., 211 N.J. 420, 448-49 (2012). Here, the judge carefully reviewed the evidence presented at trial, made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and

comports with applicable case law.  See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. 88, 103-07 (2008); K.H.O., 161 N.J. at 347-63; D.M.H., 161 N.J. at 375-93; New Jersey Div. of Youth & Family Services v. A.W., 103 N.J. 591, 604-11 (1986).  We thus affirm substantially for the reasons expressed in the judge's comprehensive and well-reasoned oral opinions.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1860-19T1