# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2929-22
A-2930-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

I.J.R. and Z.T., JR.,

     Defendants-Appellants,

and

THE BIOLOGICAL FATHER OF
R.T.R., WHOMSOEVER HE MAY BE,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF P.D.R.
and R.T.R., minors.

_____

Submitted April 15, 2024 – Decided May 20, 2024

Before Judges Gilson, Bishop-Thompson, and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0105-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant I.J.R. (James Daniel O'Kelly, Designated Counsel, on the briefs).

Jennifer Nicole Sellitti, Public Defender, attorney for appellant Z.T., Jr. (Mark Edward Kleiman, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Meaghan M. Goulding, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

I.J.R. (Irene) appeals from a judgment terminating her parental rights to her two sons, P.D.R. (Paul) and R.T.R. (Robbie).[1] In a consolidated appeal, Z.T., Jr. (Zane), who is the biological father of Paul, appeals from the judgment terminating his parental rights. The judgment granted guardianship of Paul and

---

[1] We use initials and fictitious names to protect privacy interests and the confidentiality of the record. See R. 1:38-3(d)(12).

Robbie to the Division of Child Protection and Permanency (the Division) with the plan that both children will be adopted by their resource parent, K.A. (Kay).

Irene and Zane argue that the family court erred in finding the Division proved by clear and convincing evidence the four prongs of the best-interests test necessary for termination of parental rights. See N.J.S.A. 30:4C-15.1(a). In opposition, the Division and Law Guardian urge this court to affirm the judgment and allow the adoptions to proceed. Having reviewed the record, the parties' contentions, and the applicable law, we affirm the judgment because the family court correctly applied the law and its findings of fact are supported by substantial, credible evidence.

I.

We summarize the facts from the record, including the evidence presented at a four-day guardianship trial conducted in March and April 2023. Irene is the biological mother of three children: L.R. (Lisa), born in April 2014; Paul, born in August 2020; and Robbie, born in October 2021. As noted, Zane is Paul's biological father. Irene never identified, and the Division could not locate, the biological father of Robbie. Lisa was removed from Irene's care, and Irene's parental rights to Lisa were terminated at an earlier proceeding. Kay, who had been Lisa's resource parent, subsequently adopted Lisa. Consequently, in this

consolidated opinion, we address the termination of the parental rights to Paul and Robbie.

The Division's involvement with Irene began in February 2014, when it received a referral reporting that Irene had tested positive for phencyclidine (PCP) and marijuana when she was seven months pregnant with Lisa. The Division offered Irene various substance abuse services; however, on the day that Irene gave birth to Lisa, both Irene and Lisa tested positive for PCP. Lisa was admitted into the neonatal intensive care unit (NICU) due to her withdrawal symptoms, and she remained in the NICU for over a month.

Following Lisa's discharge from the hospital, the Division obtained custody of Lisa for several months and then returned Lisa to Irene's care in September 2015. Over the next five years, Lisa was removed from Irene's care twice more due to Irene's drug use. Ultimately, Irene's parental rights to Lisa were terminated in May 2021, and, thereafter, Kay adopted Lisa.

Meanwhile, in August 2020, the Division received a referral alleging that Irene had given birth to Paul, Paul had tested positive for PCP, and Irene had tested positive for PCP and marijuana. Paul was treated in the NICU for six days after being diagnosed with Neonatal Abstinence Syndrome and exhibiting signs of withdrawal, including body tremors and constant sucking. Irene was interviewed and admitted to using PCP and marijuana prior to Paul's birth.

When Paul was discharged from the hospital, the Division removed Paul from Irene's care and placed him with Kay. Paul suffers from several medical issues, including a cardiac murmur, torticollis, a spinal bulge, and periodic fevers. Paul also struggled to eat and swallow normally and thus required specialty care, in addition to regular visits with a cardiologist.

In September 2020, Dr. Alison Strasser Winston conducted a psychological evaluation of Irene and noted that Irene appeared to be under the influence of drugs and "present[ed] with multiple factors that would impair her ability to safely parent her children." Winston recommended that Irene engage in therapeutically-supervised visitation with her children, attend in-patient and out-patient treatment for her substance abuse, and receive individual psychotherapy.

Thereafter, Irene attended and completed in-patient treatment from October 2020 to February 2021. Irene then began out-patient treatment but was discharged in March 2021 because she tested positive for PCP during treatment. Over the next six months, Irene reentered out-patient treatment at several facilities but was discharged due to her non-compliance and ongoing use of alcohol, marijuana, and PCP. Irene also failed to attend the intake appointment for the therapeutically-supervised visitation with her children.

5

Irene identified Zane as the potential father of Paul. In March 2021, a Division worker spoke with Zane, but he denied knowing Irene and requested that the Division cease contact with him. Several months later, Zane acknowledged he had slept with Irene, and both he and his mother indicated their interest in meeting Paul and being involved in his upbringing. Subsequently, in June 2021, Zane and Paul completed DNA testing, which confirmed that Zane was Paul's biological father.

In July 2021, Zane visited with Paul and was informed of Paul's special needs, medical issues, developmental delays, and doctors' appointments. Zane explained that he lived with his mother and expressed a desire to have Paul live with them. Thereafter, Zane attended supervised visits with Paul.

In December 2021, Zane attended a psychological evaluation with Winston, who recommended that he engage in parenting skills classes, individual psychotherapy, and a support group focused on caring for medically-fragile children. Winston also urged Zane and his mother to attend all of Paul's medical appointments. Winston noted that Zane did not have any serious mental health or substance abuse issues, but she expressed concern because he was a "first-time parent of a young, special-needs child . . . who lacks adequate coping strategies" for dealing with the stressors associated with being Paul's primary caregiver.

Irene gave birth to Robbie in October 2021. The Division received a referral alleging that after Robbie's birth, Irene had tested positive for marijuana and PCP, and Robbie had tested positive for PCP. Robbie was placed in the NICU for three weeks and was diagnosed with Neonatal Abstinence Syndrome that caused him to have difficulty feeding and swallowing, as well as muscle rigidity. Following Robbie's discharge from the hospital, the Division removed him from Irene's care and placed him with Kay.

Thereafter, the Division continued to offer Irene services, including individual therapy, parenting skills classes, substance abuse evaluations, and anger management services. Irene, however, failed to comply with treatment and tested positive for PCP, alcohol, cocaine, and fentanyl. In July 2022, the family court relieved the Division of its obligation to provide reasonable efforts to Irene pursuant to N.J.S.A. 30:4C-11.3(c).

Meanwhile, Zane failed to participate in the recommended therapy and parenting skills classes. Accordingly, in April 2022, he was discharged from the therapy and parenting skills program. In December 2022, however, Zane completed a parenting skills program at a different facility and engaged in individual therapy. Nevertheless, he sporadically attended Paul's medical appointments, and when he did attend, his participation was minimal. Zane also

7

failed to join any of the recommended support groups for parents of medically-fragile children.

In August 2022, the family court approved the Division's permanency plan of termination of Irene's and Zane's parental rights followed by adoptions by Kay. The guardianship trial was conducted on March 13, March 20, March 27, and April 3, 2023. The court heard testimony from five witnesses: Winston; Kay; Rashidat Aladesanmi, a registered nurse with the Division; Jason Smartwood, an adoption caseworker; and Dr. Karen Wells, a psychologist with expertise in attachment and bonding. Neither Irene nor Zane testified.

Winston was certified as an expert in psychology without objection. She testified about the psychological and bonding evaluations she had conducted with both Irene and Zane. Winston explained that from January 2019 to December 2022, she completed five psychological evaluations of Irene. She also testified that she had completed two psychological evaluations of Zane in December 2021 and November 2022.

Regarding her evaluations of Irene, Winston detailed her concerns about Irene's long-standing history of PCP use, Irene's lack of understanding as to the triggers for her substance abuse, and Irene's tendency to minimize her substance use. Winston also discussed Irene's history of being sexually abused and neglected as a child and its impact on Irene's ability to overcome her substance

8

abuse issues. Winston explained that following her second evaluation of Irene in September 2020, she consistently diagnosed Irene with severe PCP use disorder, moderate alcohol use disorder, unspecified personality disorder, unspecified bipolar and related disorder, a personal history of sexual abuse in childhood, and a personal history of neglect in childhood. Winston opined that it was not, and would never be, safe for the children to return to Irene's care.

Concerning her psychological evaluations of Zane, Winston testified that as of December 2021, Zane had not attended many of Paul's medical appointments and he had a "cursory knowledge" of Paul's special needs. Winston testified that it was significant that as of the second evaluation in November 2022, Zane had missed approximately fifty-five appointments and was not consistently attending early intervention sessions. She diagnosed Zane with an unspecified personality disorder and testified that he continually failed to adjust his lifestyle to accommodate Paul's medical and developmental needs. She opined that reunifying Zane with Paul would place Paul at an extremely high risk of harm.

Winston also testified regarding the bonding evaluations she conducted with Irene, Zane, and Kay. She explained that Paul and Robbie appeared to have a "secure and emotional attachment" to Kay. She also opined that Paul and Robbie had insecure bonds with Irene, despite being familiar with her. Winston

9

explained that Paul had an insecure bond with Zane, and Paul viewed him as a visiting companion rather than a caregiver. Ultimately, Winston opined that separating the three siblings from one another would cause them serious emotional harm, and neither Irene nor Zane could give Paul or Robbie the permanency that Kay was able to provide.

Wells was certified as an expert in psychology, attachment, and bonding without objection and testified on behalf of the Law Guardian. She detailed the psychological evaluations she conducted on Irene and Zane and the bonding evaluations she conducted with Irene, Zane, Kay, and the children. Wells opined that Paul and Robbie did not view Irene as their psychological parent because they had not been in her care since birth and Kay had provided them day-to-day care. She also expressed concern over Irene's ability to be physically, psychologically, and emotionally present for her children given her history of relapse. Based on her testing and interviews of Irene, she concluded that Irene would not be capable of safely parenting Paul or Robbie then or in the foreseeable future.

Wells also expressed concern regarding Zane's neglect of Paul due to his inconsistent attendance at Paul's appointments and intervention services. Wells opined that Paul viewed Zane as a familiar adult but that Paul would not suffer any emotional or psychological harm if permanently separated from Zane

because Paul did not view him as a psychological parent. Conversely, Wells opined that both Paul and Robbie had secure bonds with Kay and both children would regress if separated from Kay.

On May 10, 2023, the family court issued an oral and written decision finding that the Division proved by clear and convincing evidence each of the four prongs of the best-interests test necessary for the termination of Irene's and Zane's parental rights. In making that decision, the court considered all the evidence presented at trial, including the witnesses' testimonies and the documentary evidence. The court then analyzed each prong of the best-interests test as applied to Irene and Zane.

Under prong one, the court found that the Division presented clear and convincing evidence that Paul's and Robbie's health and development had been and would continue to be endangered by a parental relationship with either Irene or Zane. In that regard, the court found that Irene's extensive history of PCP use prevented her from caring for Paul and Robbie. The court credited Winston's and Wells' testimonies that the children would be at an "unimaginable" or "high" risk of harm if reunited with Irene. The court also found that Irene's consistent failure to comply with services and treatment offered by the Division— including her premature departure from facilities, positive drug tests, and non-

11

compliance with parenting and anger management classes—significantly impaired her ability to parent the children.

As to Zane, the court found that he lacked "a commitment to and understanding of his duties in raising a medically[-]fragile child" like Paul. The court noted that Zane repeatedly failed to attend Paul's medical appointments and participate in early intervention services. Moreover, the court found that Zane failed to make any changes to his work schedule to accommodate Paul's appointments or to take advantage of increased visitation time with Paul. Additionally, the court determined that it was unreasonable to prolong the children's foster care placement until Irene might obtain a significant period of sobriety or until Zane might make meaningful progress complying with the Division's recommendations.

As to prong two, the court found that the Division had presented "uncontroverted and credible evidence" that Irene and Zane were unable or unwilling to eliminate the harm facing Paul and Robbie. The court cited to Irene's continued use of PCP and the cycle of Irene "beginning substance abuse treatment, leaving prematurely, not benefitting from what she learned, and relapsing." Although the court found that Zane was not deliberately putting Paul in danger, the court found that Zane expected that Paul's activities would revolve around his work schedule. The court also credited Winston's and Wells'

12

opinions that any further delay in permanent placement of the children would add to the children's harm.

In analyzing the third prong, the court found that the Division had made a "comprehensive number of reasonable efforts" to remedy the circumstances that led to the children's removal. The court observed that the Division had offered Irene numerous services, including referrals to substance abuse treatment facilities, urine screens, hair follicle testing, therapeutic visitation, transportation services, parenting skills classes, individual counseling, and psychological, psychiatric, and bonding evaluations. The court also found that the Division had provided Zane with DNA paternity testing, parenting and individual counseling, psychological and bonding evaluations, supervised visitation, notice of Paul's medical appointments, and a list of support groups for parents of medically-fragile children.

Moreover, the court found that there were no alternatives to adoption and that the Division had assessed numerous placement options that were ultimately ruled out. In finding that kinship legal guardianship was not a viable option, the court found that Kay's desire to adopt was "informed and unequivocal" given the children's extensive medical needs that required continued monitoring.

Lastly, as to prong four, the court found that prolonging permanent placement when "the parents lack the ability to care for the child[ren] for a

13

protracted period of time" did not serve the children's best interests. The court relied on Winston's and Wells' "uncontested evaluations" and opinions that terminating the parental rights of Irene and Zane would not cause more harm than good. Additionally, the court credited Wells' opinion that severing the children's bond with Kay would likely result in "extensive and pervasive regression in [the children's] overall functioning."

## II.

On appeal, Irene contends that the family court erred in terminating her parental rights to Paul and Robbie and challenges the court's findings on prongs three and four of the best-interests test. In that regard, Irene argues that the family court failed to properly consider kinship legal guardianship with Kay or placement of the children with Paul's paternal grandmother, T.R. (Tara), as alternatives to terminating her parental rights. Irene also asserts that the court's conclusion that terminating her parental rights would not do more harm than good was based on "an incomplete record and insufficient legal conclusions."

Zane challenges the family court's conclusions on each of the four prongs. He argues the court erred in considering Zane's employment status as evidence that his parental relationship would continue to endanger Paul. He also contends the family court erred in finding that he was unable or unwilling to eliminate the harm facing Paul. Third, Zane alleges the family court failed to properly

14

consider appointing Tara as a kinship legal guardian for Paul and as an alternative to adoption by Kay. Lastly, Zane argues the court ignored the legislative amendment favoring kinship care over adoption in finding that termination of his parental rights to Paul would not do more harm than good.

Having considered all these arguments, we reject them because they are not supported by the record and the governing law. Accordingly, we affirm the judgment.

A. The Standard of Review.

An appellate court's review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 468 (App. Div. 2017) (citing N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 278-79 (2007)). An appellate court will not reverse the trial court's "termination decision 'when there is substantial credible evidence in the record to support the court's findings.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). So, "[o]nly when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). No deference is given to the trial court's

interpretations of the law, which are reviewed de novo. <u>D.W. v. R.W.</u>, 212 N.J. 232, 245-46 (2012).

B. The Four Prongs for Termination of Parental Rights.

To terminate parental rights, the Division must prove by clear and convincing evidence each element of the "best interests of the child" test, codified by N.J.S.A. 30:4C-15.1(a). <u>M.M.</u>, 189 N.J. at 280. That test is comprised of the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

These prongs "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 348 (1999).

16 

Effective July 2021, various sections of statutes concerning child protective services were amended.  See L. 2021, c. 154.  Those amendments included a change to prong two of the best-interests test.  The Legislature removed from that prong the following sentence:  "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child."  L. 2021, c. 154, § 9; see N.J.S.A. 30:4C-15.1(a)(2) (2015).  Accordingly, any harm a child might suffer by removing him or her from the resource parent should no longer be considered by a court under prong two.  Nevertheless, a court may still consider the child's bond with the resource parent, including harm resulting from the destruction of that bond, under prong four of the best-interests test.  N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 26 (2023) (explaining that in amending N.J.S.A. 30:4C-15.1(a)(2) in 2021, the Legislature "acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry").

1.    Prongs One and Two.

Under the first prong of the best-interests test, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious

effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The concern is not only with actual harm from the parent-child relationship, but also with the risk of harm to the child and the effect of harm over time on the child's health and development. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999); K.H.O., 161 N.J. at 348. In that regard, courts "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., 161 N.J. at 383. "When the condition or behavior of a parent causes a risk of harm . . . and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart" of the best-interests test has been proven. N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013).

The focus is on the "cumulative effect, over time, of harms arising from the home life provided by the parent." M.M., 189 N.J. at 289. The harm also need not be physical as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). A parent's "withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379.

Prong two relates to parental unfitness. K.H.O., 161 N.J. at 352. The inquiry "centers on whether the parent is able to remove the danger facing the child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012) (citing K.H.O., 161 N.J. at 352). This prong "may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, [and] the withholding of parental attention and care." K.H.O., 161 N.J. at 353. "The determinative issue is whether the circumstances surrounding the parental relationship, including any relationships with [others], cause harm to the child." M.M., 189 N.J. at 289.

A court may consider elements that apply both to prongs one and two because these prongs "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

Zane argues that the family court erred in finding that the Division proved by clear and convincing evidence prongs one and two. In support of that argument, Zane notes that he does not have a "specifically definable mental pathology," and has no history of substance abuse, domestic violence, or criminality. Zane further contends that he has never physically or mentally abused Paul, and that the court's sole basis for its findings was his inability to

make changes to his work schedule to accommodate Paul's appointments and services.

Initially, as noted, the "harm" that prong one contemplates need not be physical, K.L.F., 129 N.J. at 44, and thus the absence of mental and physical abuse of Paul by Zane is not dispositive.  Here, the family court found that the harm Zane posed to Paul "manifest[ed] itself in his lack of commitment to and understanding of how to raise a medically[-]fragile child" like Paul.  The court did not consider solely Zane's employment schedule in making that finding.  Instead, the court found Zane repeatedly failed to "attend [Paul's] medical appointments and participate in [Paul's] [e]arly [i]ntervention services, despite repeated recommendations by . . . Winston and the caseworker."

The court emphasized Winston's testimony that Paul requires a caregiver who not only takes Paul to his medical appointments nearly every day, but also understands the work required between services to ensure Paul's progress.  Additionally, the court highlighted Zane's denial of some of Paul's medical needs, including Paul's partial deafness and complex hand condition, which raised concerns about Zane's ability to provide appropriate care.

Contrary to Zane's contentions, there is substantial, credible evidence in the record supporting the family court's findings under prongs one and two, including Winston's and Wells' unrebutted expert testimonies.  Zane consistently

missed Paul's medical appointments despite Winston's recommendation that he attend them all. Moreover, Zane failed to join any of the recommended support groups for parents of medically-fragile children. Both experts also opined that Zane could not care for Paul at the time of the trial, nor would he be able to care for him in the foreseeable future. Lastly, both experts opined that delaying a permanent placement of Paul would add to the harm given his significant medical needs.

2. Prong Three.

Prong three requires the Division to have made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and to have "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts "depend on the facts and circumstances" of the case. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 557 (2014). Generally, the Division must "provide services to the family according to a case plan, including enlisting the assistance of relatives, providing direct services, or providing referrals to community services providers." D.M.H., 161 N.J. at 387. The Division "must monitor the services, change them as needs arise, and identify and strive to overcome barriers to service provision or service utilization." R.G., 217 N.J. at 557 (quoting D.M.H., 161 N.J. at 387). The Division should, among other things,

"encourage, foster and maintain" the parent-child bond, "promote and assist in visitation," and inform the parent of "appropriate measures he or she should pursue" to strengthen their relationship. D.M.H., 161 N.J. at 390.

Further, the Division must also "perform a reasonable investigation of [timely-presented alternative caretakers] that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013). Nevertheless, "[d]elay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligation is warranted only when it is in the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 581 (App. Div. 2011).

Both Irene and Zane argue that the trial court did not properly consider kinship legal guardianship with Kay or Tara as an alternative to termination of their parental rights. They argue that the court ignored the 2021 amendments, L. 2021, c. 154, to the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7.

Irene and Zane rely on the following language added in the 2021 amendments:

> Kinship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with

22

their families.   There are many benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions.

[L. 2021, c. 154 § 1(b).]

In citing to this language, Zane and Irene argue that the Legislature proclaimed kinship care as the preferred plan for children who are removed from their parents.  Contrary to this expansive interpretation, the 2021 amendments did not elevate kinship legal guardianship over adoption; rather, the amendments placed these options on equal footing.  A court is not required to impose kinship legal guardianship where the caregiver has decided against guardianship in favor of adoption and when adoption is in the child's best interests.  See L. 2021, c. 154, § 4 (removing the requirement in N.J.S.A. 3B:12A-6(d)(3) that a court find by clear and convincing evidence that adoption is "neither feasible nor likely" before awarding kinship legal guardianship, but preserving subsection (d)(4), which requires a court to find by clear and convincing evidence that "awarding kinship legal guardianship is in the child's best interest"); see also N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 275 (App. Div. 2019) (explaining that when a resource parent "unequivocally, unambiguously, and unconditionally" wants to adopt "irrespective of [kinship legal guardianship]"

and "termination of parental rights and adoption is clearly in the children's best interests, the final judgment to that effect should be reaffirmed").

Here, there was substantial, credible evidence that Kay's preference for adoption was clear and informed. The court relied on Kay's testimony that she was "committed to adopting the children and [was] not willing to do [kinship legal guardianship] due to [the children's] medical needs that require continued monitoring." Kay also testified that she "knows the children very well and has a unique perspective on their needs and care, which will enable her to ensure their proper development." Accordingly, the court found that her decision to adopt was "informed and unequivocal."

Lastly, Irene and Zane argue that the Division failed to meet its burden under the third prong because it did not consider a kinship legal guardianship or placement with Tara as an alternative to termination. The record reflects that the Division considered Tara as a placement option for Paul, but Tara initially removed herself from consideration due to impending hip surgery and recovery. Thereafter, Tara stated that she would provide kinship legal guardianship to Paul; however, the trial court found that the passage of time made that belated offer not a viable option.

3.    Prong Four.

Prong four requires the court to determine that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). This prong does not require a showing that no harm will come to the child "as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. "The crux . . . is the child's need for a permanent and stable home, along with a defined parent-child relationship." H.R., 431 N.J. Super. at 226. This prong may be satisfied by "testimony of a 'well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)).

Irene and Zane argue that the trial court's findings concerning prong four were not supported by substantial, credible evidence. The record does not support that argument.

The trial court relied on uncontroverted expert testimony in finding that termination of Zane's and Irene's parental rights would not do more harm than good. Specifically, the court relied on Winston's bonding evaluations, which demonstrated that the children were securely attached to Kay because she had

25

been their "only constant caretaker . . . throughout their lives and the Division's involvement." Winston opined that both Paul and Robbie had an insecure bond with Irene and did not view her as a caregiver who would consistently meet their needs. Likewise, Winston opined that Paul had an insecure bond with Zane and explained that Paul sees Zane as someone he visits as opposed to a caregiver. The court also relied upon Winston's testimony that the children showed a strong emotional attachment to Kay, who was knowledgeable of their needs and related to them as their primary parental figure. Furthermore, the court credited Winston's testimony regarding the deleterious effects of separating the siblings, which she opined would cause all the children serious emotional harm. The court also acknowledged Wells' opinion that severing the children's bond with Kay would likely result in "extensive and pervasive regression in their overall functioning." Lastly, the court credited both experts' testimonies that severing the relationship between Paul and Robbie and their biological parents would not have any adverse effects on them. In short, the family court's finding that the Division met its burden under prong four of the best-interests test was supported by substantial, credible evidence in the record, and we discern no basis for rejecting that finding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2929-22